UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        *Plaintiff,*

    vs.                          Case No. 20-cr-79-wmc

DEVONERE JOHNSON,

        *Defendant.*

## MEMORANDUM IN SUPPORT OF PRETRIAL RELEASE

Devonere Johnson, by counsel, files this memorandum in support of pretrial release. This memo has three parts. First, it addresses Johnson's background and characteristics, including his performance on probation, as they relate to the issue of release. Second, it brings to light facts about the case that the Court otherwise wouldn't know from the search warrants it has signed or the local news, which only tell part of this case's story. Third, it addresses the specific considerations under the bail reform act that this Court must consider, including addressing the reasons cited in the bond study for detaining Johnson. In addition to those points, the defense submits five letters of support that Johnson has from the community that were submitted last week to Judge Genovese as part of her sentencing considerations. All of this supports the fact that, if released, Johnson is neither a threat to the community nor a flight risk.

I.   **Johnson's background and personal history as they relate to the § 3142 analysis.**

Like many, Johnson has had a tough life. He has had minimal contact with his father and his mother is in prison. He has fifteen siblings, scattered around the Mid-West. Though raised in Chicago, he spent time in Minneapolis before settling in Madison. When he moved here in 2015, life was difficult. He had little in the way of a support network, and as a young adult he struggled with homelessness. During this time, he had some contact with law enforcement, including a theft in 2015 and a drug possession in 2014.

During a spate of homelessness, he got caught up in a scheme concocted by two men from Chicago. It was far from a brilliant scheme—the men paid homeless people to take out cell phone contracts, get a phone, and then the men would take off with the phone. (Bates 14–19). Johnson was one of those homeless men, and he double-crossed the two men, and with some acquaintances took their ill-gotten profits. (*Id.*). The crime was serious and there was an allegation that one of Johnson's cohorts used a gun. Ultimately, Johnson plead guilty to theft from a person; like his cohorts, he received a probation sentence. During his time in Dane County Jail, Johnson was diagnosed with PTSD. The defense does not have the underlying documents for what happened, but it is noted throughout his probation file and jail records that he has PTSD and was on Mirtazapine (an anti-depressant/anti- anxiety medication) to treat it.

Experience teaches those practicing in the Western District that when a defendant has allegedly committed a federal offense while on state probation he or she is rarely released. The Court's reasoning is often stated and straightforward: if state probation

didn't deter criminal conduct, why would federal pretrial supervision? There are, of course, limited exceptions. The defense submits that Johnson's exemplary and well-documented behavior on state supervision should fit that rare exception. Thankfully, he had a great probation officer, who kept meticulous notes, documenting Johnson's positive strides. I have not cited to the bates numbers here, because I went off the probation office's Compass Notes in complying this narrative. But these points are also reflected in the state probation file that the government has provided the defense with. With that caveat, here's Johnson's history on state supervision, as it relates to 18 U.S.C. § 3142(g)(3)(B)'s inquiry.

## A. Johnson is released from jail and immediately turns his life around, working and supporting his son.

For some reason, Johnson was released a month early from jail, so no one was prepared with any sort of release plan—Johnson or his probation agent. He had no housing, no resources, nothing. But during his time in jail he had been receiving treatment for his PTSD, including medication, and working on himself and forming a life plan. So while few resources were available for him, mentally he'd been preparing to do something positive with his life. When he gets out, he's homeless but checking in daily with his agent. Within two weeks he's registered at school. A few days later, he has a job at Schoep's Ice Cream. Promotion after promotion follows, as do some pretty good grades in school. The chart on page 22 spells out the specifics. To be clear, all the while he's homeless, staying on friends' couches or in a van.

Johnson did great at Schoep's and used his paychecks to pay off some of his many fines and court costs; he even made payments towards his student loans. Again the chart spells out the details. Eventually he left Schoep's to start fulltime employment at Prometal in DeForest, before making the switch to Link Snacks, Inc. in New Glarus. While his life is gaining momentum, he gets thrown a curveball. Johnson had a son, Grayson, from a previous relationship. When the child's mother couldn't care for him, she just drove from Tennessee and dropped Grayson off with Johnson. Here is a photo of the two of them on an outing around Madison.



The hours at Link Snack's was not conducive to life as a single father, and so Johnson had to look for another job. He gets several, and he finally enrolls in in apprenticeship program with the Carpenter's union. That's laudable, and certainly a good career move. But the mere fact that he joined the program misses the impressive milestones that he passed to get there. First, while Johnson is very bright, he struggles with aspects of the carpenter's test, particularly the math. So he gets a tutor and passes the test. He pushed past the adversity and it paid off; he starts making $15 an hour, and he gets a bank account and an apartment. He does that for 18 months, passes pre-apprenticeship, gets raise after raise, and life is good—he even has a very supportive and loving girlfriend, Nanu. Not to inundate the Court with photos, but this is one from his graduation within the program—a well-earned honor.



Being a carpenter means working in the construction industry, and at one of the job sites people were, unfortunately, continually using racial slurs. Johnson made a formal complaint. The fallout was severe. Things get difficult for him at the site, and he's eventually fired for allegedly going into the cab of a crane. He made a complaint with workforce development that the firing was in retaliation for the complaint about racial slurs. The workforce development found probable cause that he was fired in retaliation, and he's still pursuing his rights with an attorney.

**B. In the face of adversity Johnson does not resort to criminal conduct but works and seeks help from his therapists.**

At this point, given the formal complaints and actions, he was blacklisted from jobs and couldn't meet the union's demands for hours worked. He can't get the work he needs, but he doesn't dwell on it. At this point, his girlfriend is pregnant and he does all he can. He takes menial jobs. And he takes an even harder test to join the electrician's union. Unfortunately, the money that he needs isn't coming in, and the burgeoning family loses their apartment and they are forced to sleep in a van.

Remarkably, in the face of these circumstances Johnson doesn't resort to *any* criminal conduct, nor does he use *any* drugs. In three years of probation records and drug testing there is only one mention of drug use in his records. And it occurs when someone claiming to be Devonere Johnson was pulled over and found to be under the influence of drugs. Fortunately, the next day, the jail called and said that it wasn't Mr. Johnson but "someone named Christian Bird had provided Mr. Johnson's name when arrested."

As Johnson, Nanu, and his son struggled with homelessness he still made payments towards his restitution. And whether it's a product of karma or just good luck, Johnson and his girlfriend were able to move into the Salvation Army and eventually get an apartment at the YWCA. During this time, he's doing whatever work he can, including taking classes in masonry and joining an apprenticeship program for electricians. All the while, he's involved with community programs and promoting a vegan lifestyle with an online cooking show.[1] Some of the videos are quite good.

When COVID strikes, the jobs dry up and like the rest of the Nation Johnson began to feel overwhelmed. Instead of self-medicating, he contacts his medical provider and asks for help. In addition to the medication, he has bi-weekly video or phone visits with therapists at Access Community Health. This helps and he starts to adjust to the world's new normal—he and his family are going to get through this.

Then, when George Floyd was murdered, he tells his provider about his overwhelming feelings—his anger, his angst, and his sense of helplessness—it's all too much. Remember: life is going great a year ago, when he's with the union and before he reports the racist remarks. His therapist recommends that he join the movement, go and protest. He tells his probation officer and she agrees and supports him, with the important caveat: "as long as he was following the law and not getting into trouble."

---

[1] Johnson regularly livestreamed his cooking shows through Facebook Live, saving them to his health-food profile for viewers to re-watch at a later date. (www.facebook.com/LivebyNytr) For reference, here is one of his more popular videos:
https://www.facebook.com/100005535858999/videos/1348475848680264

There is no question that Johnson was instrumental in organizing the protests around Madison. We are awaiting 96,000 pages (not a typo) of discovery from Facebook. And it should reflect what we can see publicly: posts about yoga, advertising his vegan cooking show, and activism against racism in America. There are also videos of him at various rallies and marches around Madison and message about organizing them. What the defense has so far is what's publicly available.

Johnson's admirable behavior isn't just reflected in what's been sketched above, but it's found in the attached letters from members of the community. These letters were prepared as part of his sentencing in state court, but they speak to this Court's assessment of Johnson, and it bears on his ties to the community, but also his character and whether he poses a risk to the community if released. *See* 18 U.S.C. § 3142(g)(3)(A) (directing the court to consider "the history and characteristics of the person," including "the person's character" and "family ties"). Here is a snippet from each of the five:

- From Allison Bern: Not only is he an amazing father and someone on whom his partner depends very much, he treats the whole community like family. He did this for my kids. He is the type of guy who checks in on people especially when he knows they're in need.

- From Camara Sawyer: He's the type of guy to put other people problems before his, even if it means he is going to lose out on something. But as long as he accomplished helping someone else he is happy The love he has for his kids is beyond this world, he teaches them about the importance of living a healthy life style, how to be a strong person, focused, respectful. He wants his kids to see their dad being a part of his community helping others, changing people mindsets on keeping their bodies and minds healthy, helping people to get engaged in bettering the community for the kids to be safe and have a better life to grow up in.

- From Gail Johnson: Me for one I admire Mr. Johnson for setting a good example for the community. Always out working for the benefit of the people. Like registering to vote. He encouraged everyone to register. Register to vote come on out there is food for everyone. Happy as could be that there was food. He is also a good father teaches his son who is 4 yrs. old how to count to a hundred.

- From Letitia Hill: "Devonere is a family man. He has beautiful children. A son he has full custody of, as well as a young daughter, he has a beautiful life with children, and a loving partner who needs him. It does not end there; in a way he has more family then just his actual one. I am talking about the Dane county community. Sir, Devonere pours his positivity, and light into this community. He feeds the homeless, volunteers, stands up for what he believes in, and even inspires others with his hobby! Devonere hosts his own vegan cooking show."

- From Marcus Cota: [After COVID-19 began to spread w]e began meeting up daily and working on building workshops to teach graphic & web design. I showed him how to use different computer components and he understood everything I showed him. He showed great promise and potential. He could comprehend complex networking topics that others often struggle with.

All of this background should give the Court an accurate picture of Johnson, as his probation agent knew him and (importantly) as the community knew him. Indeed, if there's an exception to the rule that those who allegedly commit a federal offense on state supervision don't get released, this would be the case.

## II.    The alleged crime is blown completely out of proportion.

The defense has to be very clear on this: while Johnson had his probation officer's blessing to protest, she was clear that he had to follow the law. Allegedly, he didn't do that. There is an allegation that he spray painted FUCK 12 and BLM around the capitol. There is an allegation that he blocked traffic while lying in the street. And there is, of course, the very serious allegation of extortion. The most serious (and the only one that would keep him in jail) is the extortion charge. But it's important to look beyond the search-warrant affidavit and the bond study to look at the evidence we have of what really transpired, how the victim's perceived it, and whether Johnson poses a specific risk of violence to anyone in the community. Indeed, this Court has to look at "the nature and circumstances of the offense charged," including "the weight of the evidence" and "the nature and seriousness of the danger to any person or the community that would be poses by the person's release." 18 U.S.C. § 3142(g)(1) (first quote); *id* § 3142(g)(2) (second); *id.* § 3142(g)(4) (third).

### A.  The narrative no one has presented to the press or in the search warrants.

The bond study and the search-warrant applications usually begin with what happened on June 22 or June 23. But the story of this case doesn't start there. What follows comes from the testimony from his revocation hearing and evidence collected by his probation agent. While the defense fully embraces the case's bad facts (the video of Johnson with a bullhorn and a bat), those facts must be balanced with what really happened and what this trial will be about—whether Johnson was really trying to extort

these businesses of a beer or money or whether his actions are completely misunderstood and do not amount to a violation of § 1591.

On June 21, a Sunday, Johnson and another man  went to ███████████ — one of State Street's truly great bars. They asked to be seated inside. Johnson's friend had a dog with him, and the staff were told they couldn't sit inside. It's not clear if they were refused *all* service or just told they couldn't be inside. But everyone agrees that Johnson and his friend took offense at this. Apparently, the friend had been there before with a dog and allowed to sit inside. Words were exchanged, including accusations of racism.

The next day (June 22), Johnson goes back to the ██████ and he's a complete jerk. He brings in a boom box and blares music, putting his feet on the bar — always a no-no. (Bates 452). A different friend, named Greg James comes in, and with Johnson they have words with the owner about what had happened the day before — refusing to serve Johnson and his friend with the dog. (*Id.*). We don't know precisely what is said, but it gets heated. There are further accusations of racism and some profanity. The police are called, and Johnson and James leave.

The two then walk up State Street and are approached by police. The conversation is quick and they are told to "just leave." (Bates 188). As the two finish their walk up State Street, they are heated, not just from the ██████ encounter, but also from being stopped by the police. (*Id.* at 188–90). That day, a few business owners complain about Johnson — he's loud and disruptive. He walks in, boom box perched on his shoulder, and blasts profane protest music. All the while, he makes some grandiose claims about his ability to "shut down" their businesses with protestors for their racism. Johnson's actions make

people uncomfortable, and there is no reason to think that the businesses were, in fact, racist in any shape or form. While it's undeniably uncomfortable, Johnson leaves these establishments without any further drama. This happens at ███████████████████ ███████████████████████████████████████████████. (Bates 189).

Eventually, Johnson and James work their way up to the square and go into ███████████. This is June 22, and Johnson is unarmed—he has only his boom box queued with his protest mix and his attitude. At ███████, he continues his very rude behavior and, with the music blaring, puts his feet on the table. The owner (much to his credit) plays it cool and sits next to him. A conversation ensues between Johnson, James, and the owner. The video shows that the owner is not just polite, but engaging and sincere—he gives every indication of being a quality human being. The three talk about ███████ outreach and its support for the NAACP and various national organizations supporting African-Americans in particular and an end to racism generally. (Bates 454).

According to the allegations, Johnson then asks the owner what he's done locally, which he interpreted as he should donate to Johnson's organization. The police report provides this: all through this, Johnson was blasting very loud music from his boom box. ███████ said that it was at this time that he heard Johnson say something that sounded like 'Give me money or we'll break windows.'" (Bates 108). The report continued: "███ that after that he heard Johns through the loud music say 'Venmo me money.'" Johnson eventually shows the owner his phone, with a link to his Venmo account. (*Id.* at 453). The owner then takes a photo of it to placate Johnson. The two continuing talking and at some

point, Johnson or James says he is planning a rally in a couple days and there is talk of ███████ donating food. (*Id.* at 88). That's what we know from the police reports.

For its part, the security videos show that the whole time they are at ████████, James did most of the talking. He was standing and adamant while Johnson was seated, until Johnson eventually went to the bar to confront two patrons about their racist tendencies. Finally, the owner gives James his card and they leave, with James saying if he gets a call from a different area code that's his number. The owner doesn't report this interaction to the police or immediately write down a description of the two in case something does happen. He simply goes on with his business. The interaction is, however, alleged to be an attempt at extortion.

### B. The events of June 23rd do not fit the government's narrative.

That all, of course, leads to the next day (June 23), the one that everyone is familiar with and that culminated with Johnson's arrest in front of ██████. Here's the story that lead to Johnson's arrest. That morning Greg James went back to the ██████. (*Id.* at 452-53). He wanted to talk with the owner's husband, █████████. The two had apparently known each other from some time and were on friendly terms, and James wanted to discuss the incident with Johnson not being served (on June 21) and then having the cops called on them (on June 22). James is aggressive. He approaches ████ and tells him that his wife is a racist and that he needs to put her in line. To be clear, James's language is over the top, sexist, and unbelievably offensive. (*Id.* at 182). He tells ████ that where he comes from they beat women who talk like that. ████ is naturally offended and defends his wife—she's no racist.

A few hours later, James returns with Johnson and a third man, William Shanley. For some reason, the three are seeking closure about what had happened with Johnson being refused service. They confront the owner's husband again, and again he insists that his wife is not a racist. And they again speak rudely about her. As this is happening, James stands with a baseball bat and is rather intimidating. (*Id.* at 453). Again, James has the bat—not Johnson. When everything has been talked through and resolved, Shanley asks if they can order some food and the owner's husbands says yes, of course they can. All is mostly forgiven, or at least forgiven enough to be served. The owner's husband then tells them that they only accept cash and Shanley (a teacher) says that all he has is a credit card.

At this point, either Johnson or Shanley or both (we have conflicting reports) starts in on him. After all this that he and his wife had put them through—not serving them and calling the police on them—he could at least give them a free beer. ▇▇ pretends not to hear them, but they then tell him they could have closed the place down like they did ▇▇▇▇▇, and that they could have had 600 people there and "burn it down," but they didn't. (*Id.* at 181). ▇▇ nsists the business has no money, they are going bankrupt, but in an attitude of "this will make it end" he reaches into his pocket and shows them that he's paying the tab with his own money. (*Id.* at 184). He has $20.00. And he then pours them three beers and puts in an order for a burger and fries. For his part, Shanley doesn't want the free beer that's offered, and he has the temerity to ask for an upgrade to a Guinness. The three then enjoy their beer and Johnson gives the burger to a homeless man—he is, after all, a vegan.

The three then leave, with Johnson going up State Street like he did the day before, provoking people. He carries James's bat and instead of a boom box, he has a megaphone. A few businesses call the police and report his behavior. And he ultimately gets to ███████, and he has the confrontation that everyone has seen. What the videos don't show, however, is what set him off and this is from the discovery. While ████████ customers are trying to enjoy their lunch, Johnson is being quite rude, talking into the microphone about asking whether people support Black Lives Matter. (Bates 68). And one of the patrons decides to engage, and he responds to Johnson's inquiry: all lives matter. (*Id.*). According to the report "that seemed to make Johnson mad." (*Id.*). The man's father then gets up and goes inside, and this Johnson follows—we have all seen the video.

He is eventually arrested, escapes, and is finally put in custody. As this is happening, there are two things to note. First, Shanley (the teacher who was at the ████ ████) approaches on a bike. He goes to a police officer and explains that he and Johnson had just been to the █████████ because Johnson had experienced a macroaggression there. This is from the police report:

> He stated when Johnson left the Capitol lawn he began speaking with him and learned he was an activist who was trying to express his opinions Shanley stated he and Johnson eventually played two games of chess and *he learned that Johnson experienced macroaggressions from employees at the over the past couple of days Shanley stated he and Johnson walked to the to resolve the disagreement between Johnson and the employees*

(Bates 89 (emphasis added)). That is, the █████████ incident is not a three-day long concerted extortion attempt but a disagreement (fueled by a macroaggression) that involved some over-the-top language.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

The second point worth making is that this is the first time that Johnson has been in custody on a probation hold since 2017. To be fair, he'd been arrested once for driving after revocation and another time for protesting. I believe he's released the same day or the next on each. But in the years since his release on probation, this was the first time he's been in custody for anything serious or that his probation officer detained him. In all the years he was on probation he never even had a probation hold. He had, in a word, walked the line and abided by his supervision rules.

Again, in the spirit of embracing the case's bad facts, this week the government supplied the defense and probation with a police report for various police contact that Johnson has had over the years. (Bates 709–11) In it, the officer has gone through *all* of Johnson's police contacts since 2011, and (relevant here) it cites threats he made after his fiancée was sexually harassed at work. (*Id.* at 710). It's a little strange to get a report like that, where the officer doesn't report facts but opines that "the incidents mentioned above show a pattern of behavior by Johnson disrespectful of law and order." (*Id.* at 711). The noteworthy part of it all is that none of the cited behavior, while Johnson was on probation, leads to an arrest—let alone a sanction from his probation officer. That is, while the defense fully intends to hear a government proffer that while Johnson was attending to providing for his family, making his online vegan cooking show, and paying off his fines, he was also menacing Madison, the fact is that the allegations the report cites lead to nothing. As in: upon investigation they didn't happen and didn't merit either an arrest, a charge, or a probation sanction.

### C. The investigation into Johnson's alleged extortion and what it doesn't show.

It's very apparent that Johnson's behavior on June 23 constituted a fair amount of state offenses—particularly disorderly conduct while armed. He was incredibly rude and disruptive, and he made some very good people's lives harder. But the investigation goes beyond some Class A misdemeanors, and the FBI goes up and down State Street, interviewing the business owners seeing who else Johnson had extorted. Many had dealings with Johnson. One bar (████████████) remembers him trying to get a free beer. (Bates 120). Others remember him making inappropriate statements and disrupting business—a few had even called the police.

But here's what none of them reported: that Johnson had been violent. And for that matter, none of the businesses reported that he tried to extort money from them. To be clear, one said he tried to get a free beer, but that's it. Despite a heavy FBI-led investigation into a very significant local case that spawned a lot of media attention, there is nothing to suggest that this was a pattern of dangerous behavior, targeting local businesses. Nothing suggests that Johnson was running a racket, trying to extort money from business and that if they failed to comply he'd destroy them. Indeed, the owner of ████████ didn't report the incident from June 22, and he only took a picture of Johnson's Venmo to placate him.

What follows from the complaining witnesses bears directly on the § 3142 calculus, particularly as the Court weighs "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). That danger can't be a generalized, we're worried; rather, for Johnson to be detained, the

danger that he poses to the community must be specific. *See United States v. Hammond*, 204 F. Supp. 2d 1157, 1164–65 (E.D. Wis. 2002) (denying government's motion to detain the defendant where the defendant had strong family ties, was "respected by neighbors and business associates," had a "minor criminal history", and where the government failed to explain how he "*would pose a risk to any specific person if released.*" (emphasis added)). And here (of course) the specific danger would be to those businesses identified in the Indictment. But there is nothing to suggest that they fear if Johnson is released that he will harm them. The opposite is, in fact, true.

After Johnson's arrest, the owner of ████ called Johnson's probation officer and offered to post his bond—so long as it didn't exceed a grand. Not only that, when the probation office followed up with him to get a statement about what happened, he told her that there had been no threat to damage property if money wasn't received. He also wrote a statement. In it, he wrote:

Statement - ████ REDACTED ████          7-1-20

On 6/21/20, I saw a video of Devonere on the patio with a bat. He was with other people; they sat down with the customers. One guy had a megaphone.

On 6/22/20, Devonere and another male came in. I could hear loud music. Devonere was sitting down with his feet up. I asked him to turn it down and he said, "I can hear you." He eventually turned it down. The other man joined the conversation; he was a little more quiet. The other man said they planned to ~~protest~~ have on block party that Wed. night. ~~Devonere~~ We offered to donate food for that event. Devonere told me to venmo him money. I told him I didn't have any money because we were closed for 86 days. The music was still pretty loud at that point. I took a photo of his Venmo code. I gave the other guy my business card. He told me to expect a call from a 618 area code. Then they left. I didn't feel threatened but I felt concerned.

On 6/23/20, I was in the kitchen and staff came and got me. Devonere was outside with a bullhorn and bat, screaming at customers. He followed a man in while holding a bat and called him racist. He wouldn't stop so I called police. Once he came

████ REDACTED ████          7/1/20
Victim/Witness Signature          Date

_Danielle McOny_          7-1-20
Agent   Signature          Date

JOHNSON 000160

And when Madison Police interviewed the owner immediately following the June 23rd incident, he was consistent (and adamant) about the nature of the interaction: "He said that the type of behavior had been occurring regularly in the last several weeks and he was not disturbed by it." (Bates 88). Now, to be clear, soon after the owner's statement to the probation officer was released, Agent Boxwell went to see him and he supposedly backtracked on that statement: "███████ stated that his statement with the PO was fast, only meeting with her for a few minutes since he was busy at work." (*Id.* at 47). Maybe that's true. I will volunteer these two observations: first, a conversation that only lasts a few minutes rarely results in a written-out and signed statement. Second, when someone has been extorted, busy or not—they will talk about it. And they are not volunteering to post bail for the person who threatened them. Nor, for that matter, are they writing the victim witness coordinator at the United States Attorney's Office and saying that he was concerned

Good afternoon Andrea,
It was nice to meet you yesterday. I don't have Cory's email just wondering if you could pass my message along. I'm very concerned about the amount and severity of charges against Mr. Johnson. I believe the charges are too harsh. My wife and my business partners are also concerned. I do not want to part of the process to press for anything further. Understood that I don't have a choice if subpoenaed again, and I've always been helpful and cooperative to everyone who became involved in this, but I want you and Cory to know that I do not feel like a victim. If there are other victims, perhaps they feel differently. As long as the baseball bat or any other weapon is out of the restaurant, I am satisfied.

Thank you.

I will, however, freely admit that when ███████ went before the Grand Jury, he gave a different statement and placed Johnson's behavior more in the threating than disturbing camp. But that is an issue for trial and for the jury to decide: what precisely

did Johnson say, what did he mean his words to convey, and what did he intend from those words? The discrepancy and owner's behavior bears directly on both the weight of the evidence against Johnson, and it also bears on the central question for purposes of release or detention: this is hardly a typical Hobb's Act case. And Johnson's alleged request for a burger he didn't eat and potential donation to his local efforts hardly fall into the category that would normally demand detention.

### D.  The state court's treatment reflects that reality.

This Court has not had the benefit of a full adversarial hearing on Johnson and his behavior, so it's at a disadvantage. There was, however, such a hearing in state court last week. The state revoked Johnson's five-year probation term for, among other things, his behavior at the ███████ and ███████. And at the sentencing hearing, the prosecutor asked for a stout five year sentence. It would have been Johnson's first time in prison. The judge, however, looked at all Johnson had done on supervision and the unusual circumstances of this case and she concluded that the probation office's recommendation was the correct one. It had recommended a time-served sentence. And Judge Genovese felt that was appropriate. Normally, state court sentences are a poor barometer of how someone will fare in federal court. The sentences are just so different—mostly because of the mandatory minimums. And my argument is not that the state thought this didn't warrant prison, so you should let him out on supervision. Not at all. The state court was troubled by his behavior. But the judge also knew that Johnson's behavior in June of 2020 was out of character with the person who had made so, so many positive strides over the

last few years. His record is truly remarkable. Here is the timeline that was promised

before.

| Date | Event |
|---|---|
| 04/28/17 | Released from custody |
| 05/10/17 | Enrolled at MTAC |
| 05/24/17 | Got position at Schoep's Ice Cream in Madison $12/hr. |
| 08/09/17 | Opened a checking and savings account through Wells Fargo |
| 08/28/17 | Began education at Madison College in Business Mgmt. Associates program |
| 09/07/17 | Hired as forklift operator $12/hr. |
| 09/07/17 | Still owes $1700 but paid off one ticket off |
| 09/25/17 | Good grades in school (psychology) |
| 10/05/17 | Begins making effort to repay restitution, owes less than $700 |
| 10/05/17 | Now making $14.05/hr. Began training for Material Handler position, which could be another $0.20 raise, on 10/4/17 |
| 10/05/17 | Paid off tickets in TN but still owes around $800 for MN and $200 for WI |
| 11/21/17 | Paid $720 towards $900+ MN ticket balance |
| 12/20/17 | Got a B in psychology |
| 01/05/18 | Started working at Prometal Works in DeForest FT making $15/hr. |
| 02/27/18 | Gained full custody of son |
| 03/23/18 | In a paid apprentice program Wisconsin Regional Training Partnership |
| 04/20/18 | "Getting tutored through Big Step on the testing requirements for the Carpentry program. Passed the Brick Laying test. Just needs to take an algebra test for the Carpentry program. He filled out applications for Masonry, Brick Laying and Carpentry. Not hiring until next month." |
| 04/20/18 | Secured housing in Maple Lawn Apartments. |
| 04/20/18 | Passed drug test for Village Hearth |
| 04/20/18 | Began paying $5/mo. for 9 mos. toward student loans |
| 05/21/18 | Moved into apartment |
| 05/22/18 | Received job at a prominent construction company |
| 07/31/18 | Raise at the Construction now making 20.41/hr. → transitioned from pre-apprentice to apprentice Got a white board to keep track of appointments |
| 02/05/19 | Plans to pay off restitution after refund comes through |
| 03/11/19 | Has FT Concrete Training classes |
| 04/09/19 | Went back to work on a job in Whitewater, got a raise now making $22.70/hr. |
| 06/11/19 | Working at a job site in town, received another raise. |
| 11/12/19 | Started orientation at Koenig Concrete, expected to begin work the following week at $20/hr. |
| 12/12/19 | Made a $50 restitution payment |
| 01/17/20 | Working temp basis at Joint Construction |
| 03/06/20 | Applied for electrician's union and is waiting to hear back |

The chart shows a person committed to working within the system—one who had done all he could to be a positive member of society. And whether or not Johnson's conduct meets the definition of extortion, no one believes that what he did is a typical extortion crime. Indeed, what happened at the ▬▬▬▬ was not rooted in a three-day-long attempt to get $16.00 in beer and a burger. Rather, the disagreement grew out of a perceived act of discrimination at a time when everyone was hyper-vigilant about such instances—whether they are intended or just perceived as such. And Johnson's behavior was rooted in addressing that incident. And while the ▬▬▬▬▬▬ incident has more of the marking of a traditional extortion attempt, the evidence is foggy at best. Only a jury can decide what Johnson actually said and intended.

### III. These facts as judged through § 3142's rubric.

This case comes down to two central questions: whether the government can establish that no combination of conditions can ensure the community's safety; and whether the government can establish that no combination of conditions can reasonably assure Johnson's presence in court.

### A. Johnson is not a flight risk.

It should be obvious, but Johnson is not a flight risk. His family is here. He has a fiancée, with their newborn daughter and a son. He's intimately involved in their lives. And he's worked very hard to be a father to his children and a provider for his fiancée. Johnson is not going anywhere. And his behavior on probation just reinforces that central idea: he will show up to court and he will abide by this Court's order.

### B. Johnson is not a danger to the community.

This analysis is a bit trickier. I am going to leave some points alone until addressing the bond study's specifically cited reasons, but for the most part Johnson simply isn't a threat to the community. He has some limited criminal convictions, and theft from a person is not a petty crime. Yet, it happened years ago, when Johnson was you and desperate. It also happened when he was dealing with PTSD and didn't have the benefit of meds and counseling.

What's more, his behavior on probation has simply been exemplary. For three years, he has worked and been in school. He worked extremely hard and did all that was asked of him—even paying money towards his restitution when he was homeless. He is not someone whose criminal conduct has escalated until he finally graduated to the big time, with extortion. Nor is he someone whose life is marked with a reckless disregard for the safety of others. Rather, it has been marked by a real concern for people. You don't promote veganism and garner the letters from the community that he has if you're just a ne'er-do-well.

Instead, Johnson's life reflects the very real fact that you can be a good person who, during an extremely emotional time in our Nation's history, just lost his better judgment. I don't think that Johnson's actions constituted extortion. Inappropriate? Yes. Incredibly bad manners? Also yes. But extortion? No—a jury will decide. For purposes of release, Johnson's actions lack the markings of a criminal set on taking money from others by preying on their fears of violence. Instead, they have the markings of someone who was caught up in a moment and who has been misunderstood. That moment (the response to

George Floyd's murder) was a moment that many (if not most) acted appropriately and with peaceful protests. But it was also a moment when others got caught up in a rush of feelings and acted rashly. That's true of many who had never committed a crime before and engaged in aberrant behavior. Examples abound: from grandmas spitting on people and lawyers throwing Molotov cocktails, to teachers (allegedly) attacking state senators. Since George Floyd's murder, it's been a time when some people have acted against their better judgment and in a manner that doesn't reflect their true self.

When the Court looks at the allegations against Johnson and asks whether they accord with someone who lost his better judgment and acted inappropriately or whether he stands in the tradition of the Mafia, extorting businesses with fear—bad things happen to those who don't pay—it's clear where his behavior falls. *United States v. Dominguez*, 783 F.2d 702, 706-707 (7th Cir. 1986) (noting a defendant need only show "that the specific nature of the crimes charged, or that something about their individual circumstances, suggests that *what is true in general is not true in the particular case*." (quotation omitted) (emphasis added)). And that's why this Court can set conditions and be reasonably assured that when Johnson is released he'll abide by them. That is, after all, what the law demands—nothing more than a reasonable assurance. The law doesn't demand absolute certainty. *See United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990) (noting that "[r]equiring that release conditions guarantee the community's safety would fly in the teeth of Congress's clear intent" (emphasis in the original)). Rather, "courts cannot demand more than an objectively reasonable assurance of community safety." *Id.* (quotation omitted). And here, the Court has that in spades.

### C. The bond study's points are not moored to the record

The defense is, of course, not just fighting against the government for Johnson's release, the defense also has to contend with the bond study's assessment—as assessment that carries great weight. The bond study gives a lengthy recitation of reasons for detaining Johnson. It begins: that the risk of danger is tied to the offense, Johnson's criminal history, his mental health history, and the fact that he was on supervision. And it continues with specifics, and it's those specifics that demand addressing:

> ➢ The defendant also appears to have a history of marijuana use, as indicated by the 2011 marijuana charges, but denied to this officer ever having used a controlled substance in his life.

Two points in response: first, you don't have to use marijuana to sell it. So the mere fact that he was arrested doesn't mean he was lying. Second, he was on probation for three years and there was never even a hint of drug use. There is nothing that suggests if released drug use would pose a risk to the community.

> ➢ The defendant has criminal history dating back ten years, with arrests for violence, domestic violence, and murder. The defendant was acquitted of the murder, though it appears he did shoot the victim in self-defense while on public transportation.

The decade-long criminal history is two marijuana offenses. And then the murder allegation, and the bond study provides this qualifier: "The defendant was acquitted of the murder, though it appears he did shoot the victim in self-defense while on public transportation." It's impossible to decipher why any of that matters. Indeed, it insinuates that Johnson was the aggressor. But he was acquitted. Meaning: he had the truly unfortunate experience of being attacked on a city bus, and that attack was so bad that a

jury found that he was justified in using deadly force. There is nothing about being the victim of an attack and using justifiable force that makes it so no combination of conditions could be fashioned.

> ➢ He has only one felony conviction for theft, but it appears the theft involved a strong-arm robbery where one of his cohorts discharged a firearm at the victims.

This is pure conjecture. We know what the allegations in the criminal complaint are. But the criminal complaint is not a reliable basis to decipher what actually happened. Instead, we look at the plea hearing and the conviction. *See United States v. Edwards*, 836 F.3d 831, 837 (7th Cir. 2016). Whatever happened in 2015 the prosecutor, who knew the facts and weighed the evidence, found merited a theft from person charge. And he has paid his debt for that conviction. What his cohorts may have done, or are alleged to have done, is not a basis to impute to Johnson now—four years later.

> ➢ In the instant case, the defendant is alleged to have gone into several local businesses with a baseball bat and demand money or property.

That's an incorrect statement and is not tied to the discovery or the actual allegations. Johnson never went into a business and demanded money with a bat. He was with James, when James had a  bat at ▮▮▮▮▮, where they talked through a perceived slight and then badgered the bartender into giving them a beer. And he carried a bat at ▮▮▮▮▮▮▮ when he told the patrons (and the world) that Jesus was black. But he didn't demand any money or property with the bat. The alleged extortion happened the day before when Johnson was only armed with a boom box. So that statement is neither correct, nor does it favor detention.

➢ He allegedly threatened to have the businesses burned down if the owners did not comply. His behavior was captured on video.

That also isn't true. The alleged shakedown of ██████ happened *after* he had made threats about the business and shutting it down. It's pretty clear that his hyperbole was not part of a long, drawn-out demand for free beer. But a continuing disagreement over what happened days earlier and whether he was denied service because he was black. And it's hard to know what it means about the behavior being captured on video. We have video of Johnson being at the ████. We don't dispute that he was. What we don't have is the words that he used—and that's what matters.

➢ His history is replete with examples of poor decision making and responding to problems with violence.

It's hard to look at Johnson's history and say it's replete with poor decision making. He has a couple instances. No question. Most people who appear in federal court have a few—indeed, most who live through their twenties have a few. But Johnson does not have a history of responding to problems with violence. He responded to having his life threatened with violence in Minnesota, but beyond that, there is nothing to suggest that Johnson is a violent person. The bond study is just off on that point. He's a very peaceful person, one who should not be detained because his actions may have been misunderstood.

## IV.    Conclusion

This is a long bond memo, the longest I have ever written, and in many ways it had to be. There is too much to this case to just argue in Court. Too many nuances and too much history to work through. But it's here; it's all here supporting his release: Johnson's history, the circumstances or these alleged offenses, and the reasons that fully support his release. Without this deep-dive into the case, he would probably present as a wobbler—maybe he should get out, maybe not. But given all the facts proffered here, this is not a case where the government can meet its burden. Johnson is not a threat to the community. And thus, he should be released pending trial.[1]

Dated at Madison, Wisconsin this 28th day of September, 2020.

Respectfully submitted,

Devonere Johnson, Defendant

*/s/Joseph A. Bugni*
Joseph A. Bugni

FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
Joseph_bugni@fd.org

---

[1] As a final note, I tried to read this to Johnson today. Unfortunately, the jail has a new phone provider and despite repeated efforts and waiting, I could not read it to him. There could be some small details that I am mistaken on and if I can read it to him before the hearing, I will correct the record. But these representations are mostly from the record and investigation.